☐ Original ☐ D



CLERK'S OFFICE
A TRUE COPY
Oct 07, 2025
s/JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

|  |  |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. **25-M-506 (SCD)** |
| 11361 West Peregrine Way, Greenfield, Wisconsin (TARGET RESIDENCE), as further described in Attachment A | ) ) ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____10-21-25_____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Stephen C. Dries_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____10-7-25. 9:45 am_____

*Judge's signature*

City and state: _____Milwaukee, WI_____      Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
|  |  |  |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**Attachment A**

<u>**SUBJECT PREMISES**</u>

1.     This affidavit is submitted in support of an application for a search warrant for the following location: The real property and premises known as **11361 WEST PEREGRINE WAY, GREENFIELD, WISCONSIN, 53130** and all storage areas associated with the residence (attached or detached), (**TARGET RESIDENCE**).  The property is a single-family, condominium style home, located on the east side portion of the multi-family structure, where West Wingspan Lane and West Peregrine Way meet. The pedestrian door to 11361 WEST PEREGRINE WAY, is situated on the east side of the structure and is the furthermost northern door. The numbers "11361" are affixed above the attached overhead garage door, which faces north towards West Wingspan Lane. The building has tan colored siding and brick facia, and a single car driveway leading up to an attached garage.



**Attachment B**

**Items To Be Seized**

Evidence of a violation or violations of Title 21 U.S.C. 846 (controlled substances trafficking) and Title 18 U.S.C. 1956 (Money Laundering), including the following:

1.      Marijuana, and/or any other controlled substances.

2.      Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances.

3.      Address and telephone books and papers reflecting names, addresses or telephone numbers.

4.      Books, records, receipts, bank statements and records, money drafts, letters of credit, money order and cashier's checks, receipts, pass books, bank checks and any other items evidencing the obtaining, secreting, transfer, or concealment of assets in the obtaining, secreting, transfer, concealment or expenditure of money.

5.      Purchase agreements, rental agreements, tax records, financial documents, to include but not limited to receipts, invoices, bills, ledgers, journals and other records related to income, expenditures and the purchase or sale of assets.

6.      Brokerage account statements, investment related records, other documents and items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment, and/or expenditure of money.

7.      Electronic equipment, such as cellular telephones, computers, telex machines, currency counting machines, and any information stored in memory or contained in any related hardware and software.

8.      United States currency, precious metals, jewelry and financial instruments, including but not limited to, stocks and bonds.

9.     Photographs, in particular, photographs of conspirators, of assets, or of controlled substances, and other documents identifying associates and conspirators.

10.    Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including but not limited to, pill presses, scales and baggies.

11.    Indicia of occupancy, residency, or ownership of the premises, including but not limited to, utility and telephone bills, canceled envelopes, and keys, as it related to the instant drug investigation.

12.    Firearms.

13.    Any locked or closed containers believed to contain any of the above listed evidence

14.    Computers, cellular telephones, or storage media used as a means to commit the violations described above;

For any computer, cellular phone, electronic device, and storage medium whose seizure is otherwise authorized by this warrant, and any computer, cellular phone, electronic device, and storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

      a. Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

      b. Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

of the presence or absence of security software designed to detect malicious software;

c. Evidence of the lack of such malicious software;

d. Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. Evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. Evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. Evidence of the times the COMPUTER was used;

i. Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. Records of or information about Internet Protocol addresses used by the COMPUTER;

l. Records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. Contextual information necessary to understand the evidence described in this attachment.

15. Records, information, and items relating to violations of the statutes described above, including:

a. Records, information, and items relating to the occupancy or ownership of the TARGET RESIDENCE, including utility and telephone bills, mail envelopes, or addressed correspondence; records, information, and items relating to the ownership or use of computer equipment found in the above TARGET RESIDENCE, including sales receipts, bills for Internet access, and handwritten notes; and

b. Records and information relating to the identity or location of the persons suspected of violating the statute(s) described above.

16. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies). The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware. The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media. During the execution of the search of the TARGET RESIDENCE described in Attachment A, law

enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.



CLERK'S OFFICE
A TRUE COPY
Oct 07, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
11361 West Peregrine Way, Greenfield, Wisconsin ) Case No. **25-M-506 (SCD)**
(TARGET RESIDENCE), as further described in )
Attachment A )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. § 846; & 843(b); and 18 U.S.C. §§ 1956 | Conspiracy to Possess with Intent to Distribute/to Distribute Controlled Substances; Laundering of Monetary Instruments |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

❒ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jeff Buckles, Special Agent DEA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: 10-7-25
_____

_____
*Judge's signature*

City and state: Milwaukee, WI          Honorable Stephen C. Dries, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT

I, Special Agent Jeff Buckles, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.          I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510, in that, I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516. I am a Special Agent with the Drug Enforcement Administration (DEA) and I have been employed by the DEA since 2014. My first assignment with DEA was the Bismarck, North Dakota, Post of Duty.  I have been assigned to the DEA Omaha Field Division since November 2022 and is charged with investigating drug trafficking and money laundering violations. I have attended the Drug Enforcement Administration Basic Agent Academy in Quantico, Virginia, which has an emphasis in drug trafficking, money laundering, undercover operations, and electronic and physical surveillance procedures.   I have been involved in numerous investigations dealing with the possession, manufacture, distribution, and importation of controlled substances.  During the course of my employment, I have been involved in the investigation of multiple controlled substance violations. As a result of my training and experience, I have become familiar with the methods and techniques utilized by controlled substance violators to import, transport, manufacture, distribute, and conceal controlled substances. In addition, I have conducted investigations concerning the concealment of narcotics proceeds, including assets, monies, and bank records, and the identification of co-conspirators through the use of drug ledgers, phone records, bills, photographs, and financial records.

2.          The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, and witnesses.  This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.          In conducting my official duties, I have participated in narcotics investigations of alleged criminal violations of the Controlled Substances Act. Throughout these investigations, I have become familiar with the retail drug trade. Through these investigations, training and conversations with other agents familiar with narcotics trafficking and money laundering, I have become familiar with the methods employed by individuals and organizations engaged in narcotics trafficking and money laundering. Through these narcotics investigations, I have participated in the arrest of individuals involved in the smuggling, distribution, and sale of illegal narcotics. Through post arrest interviews of individuals involved in the smuggling, distribution, and sale of illegal narcotics, I have learned the various methods employed by drug dealers to import, distribute, and sell illegal narcotics in the United States. Through investigative experience, training, and conversations with other special agents familiar with narcotics trafficking and money laundering, I have also become familiar with the use by drug traffickers of telephones to communicate; the patterns of activity of drug traffickers; the types and amounts of profits made by drug dealers; and the methods, language, and terms that are used to disguise the source and nature of the profits from their illegal drug distribution activities.

4.          In conducting my official duties, I have participated in investigations involving purchases of controlled substances from suspected narcotics traffickers using both undercover operatives and confidential sources. In addition, I have acted in an undercover capacity on multiple occasions. I have participated in investigations involving the wire communications interception of conversations, pursuant to court authorization. I have participated in the execution of search warrants for narcotics, proceeds, and documentary evidence of narcotics trafficking. I have

conducted surveillance in connection with narcotics investigations. Through the course of these investigations, I have personally interviewed confidential sources and persons arrested for the distribution of illegal narcotics. I have also spoken with more experienced narcotics investigators with whom I have worked concerning the practices of narcotics traffickers and the best methods to use in the investigations of narcotics trafficking organizations. My training and experience as an investigator; my participation in the investigation of narcotics trafficking organizations; conversations with known narcotic traffickers; and conversations with other special agents familiar with narcotics trafficking and money laundering form the basis of opinions and conclusions set forth below, which I draw from the facts set forth herein. I am familiar with narcotics traffickers' methods of operation, including, the distribution, storage, and transportation of narcotics and the collection of money proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds. I have conducted investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as related money laundering statutes involving the proceeds of specified unlawful activities and conspiracies associated with criminal narcotics, in violation of 21 United States Code §§ 841(a)(1), 843(b), 846, 952(a) and 963, and Title 18 United States Code §§ 2, 1956 and 1957.

5.        I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation, conclusions I have reached based upon my training and experience, discussions with other federal and state law enforcement personnel familiar with this investigation, and upon information I believe to be reliable from sources including: oral and written reports, physical surveillance conducted by law enforcement, phone records, information from cooperating sources, law enforcement databases and public records.

6.        Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by a DEA special agent, another law enforcement officer, confidential source, or a source of information (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose reports or statements I have reviewed.

7.        This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence and instrumentalities of violations of Title 21, United States Code, Section 846 (conspiracy to manufacture, distribute, dispense, or possess with the intent to manufacture, distribute, or dispense a controlled substance) and Title 18 United States Code, Section 1956 (laundering of monetary instruments) are located at 11361 WEST PEREGRINE WAY, GREENFIELD, WISCONSIN (HEREAFTER: **TARGET RESIDENCE**).  I have probable cause to believe that evidence, as described in Attachment B, of violations of criminal law, including violations of Title 21, United States Code Section 846 (conspiracy to manufacture, distribute, dispense, or possess with the intent to manufacture, distribute, or dispense a controlled substance), and Title 18 United States Code, Section 1956 (laundering of monetary instruments) will be located in the **TARGET RESIDENCE**, as described in Attachment A.

## DESCRIPTION OF PREMISES TO BE SEARCHED

8.         This affidavit is submitted in support of an application for a search warrant for the following location: The real property and premises known as 11361 WEST PEREGRINE WAY, GREENFIELD, WISCONSIN, 53130 and all storage areas associated with the residence (attached or detached), , (**TARGET RESIDENCE**).   The property is a single-family, condominium style home, located on the east side portion of the multi-family structure, where West Wingspan Lane and West Peregrine Way meet. The pedestrian door to 11361 WEST PEREGRINE WAY, is situated on the east side of the structure and is the furthermost northern door. The numbers "11361" are affixed above the attached overhead garage door, which faces north towards West Wingspan Lane. The building has tan colored siding and brick facia, and a single car driveway leading up to an attached garage as depicted below:



9.         Based on my training, experience and participation in this and other drug investigations, I know that it is common for drug traffickers to maintain in their residence, the items listed in Attachment B. Furthermore, as a result of my training and experience, I am familiar with how various drugs are used, the typical distribution and trafficking methods used by drug dealers and traffickers, and methods used by drug dealers to conceal their controlled substances

and illegal proceeds. Additionally, I am aware that drug traffickers commonly possess firearms as a means of protecting the controlled substances they distribute and the proceeds derived from the sales of these controlled substances. I further know that it is common for drug traffickers to use commercial storage units/garages apart from their residences in furtherance of drug trafficking. Drug traffickers handling multi-pound quantities of narcotics often use storage units/garages to offload narcotics from delivery vehicles driven by couriers, often in concealed traps within the vehicles. Drug traffickers are then able to transfer narcotics to other locations for local distribution. Drug traffickers also may use storage units to transfer drug proceeds destined for narcotics suppliers within the trap vehicles.

10.        My awareness of these practices arises from my own involvement in prior drug investigations and searches during my career as a law enforcement officer to include my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, and what other agents and police officers have advised me when relating the substance of their similar debriefings and results of their own drug investigations.

11.        I know that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. I know that professional narcotics operations depend upon maintaining their extensive contacts. The use of telephones is essential in maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain to the local traffickers. The telephone enables narcotics dealers to maintain contact with narcotics associates, narcotics suppliers, and narcotics customers. I also know that narcotics traffickers often use fraudulent information to subscribe to communication facilities, especially cellular telephones,

and frequently change communications facilities to thwart law enforcement efforts to intercept their communications.

12.        In addition to the items included in Attachment B, as outlined above, I know the following to be true and correct:

     a.  That the courts have recognized that unexplained wealth is probative evidence of trafficking in controlled substances. As such, financial documents can show evidence of narcotics trafficking. "Financial" documents include, but are not limited to: receipts, bank records, financial statements, money orders, cashier's check receipts, property records, vehicle records, invoices, statements, ledgers, investment records, tax records, correspondence, diaries, and handwritten notes. Using financial documents, law enforcement investigators may analyze monies spent by suspected narcotics traffickers and subtract any legitimate income to approximate earnings from narcotics trafficking. In addition, traffickers maintain records of transactions involved in the disposition of proceeds. Based on my training and experience, individuals often maintain such documents for an extended period of time, and such records are often maintained at their places of residence or their places of business. Currency, monetary instruments, precious metals, jewelry, and other items tending to show the accumulation of wealth, including wealth gained from illegal activities, are also probative of unexplained wealth and trafficking in controlled substances.

     b.  It is generally a common practice for drug traffickers to maintain records relating to their drug trafficking activities in their residences. Drug traffickers often "front," (sell on credit), controlled substances to their clients, and/or receive controlled

substances on a "front" from their suppliers, and therefore, record-keeping is
necessary to keep track of amounts paid and owed, and such records are often
maintained close at hand in order to readily ascertain current balances.

c. Individuals attempting to conceal their assets and other individuals receiving
income from illegal sources often secrete currency and other monetary instruments
within safe deposit boxes, and keys and rental agreements for these boxes are often
maintained in a secure location within the renters' residences or places of business.

d. Drug traffickers commonly use cellular telephones to communicate with their drug
sources of supply, drug customers and other individuals who assist in the
distribution of controlled substances. It is common practice for drug traffickers to
keep their cellular telephones on their persons in order to easily communicate with
suppliers, customers and other confederates in secure locations, such as their
residences. Based on my training and experience, I know that these devices can
contain evidence such as call logs, contact lists, text messages, photos, video, and
the phone number of the device itself, all of which may constitute evidence of
participation of drug trafficking.

13.     In a number of searches executed in connection with drug investigations in which
I have been involved, the following kinds of drug-related evidence have often been found in the
residences of the subjects or in their places of business, or both:

a. Books, records, receipts, notes, ledgers, and other papers relating to the distribution
of controlled substances and the disposition of proceeds.

b.  Books and papers reflecting names, addresses, telephone numbers, and other contact or identification data for persons involved in the distribution of controlled substances.

c.  Photographs and other documents to show the identities of associates or co-conspirators, and/or to identify the location of criminally derived property.

d.  Cellular telephones which may contain contact lists, call logs, stored messages, photographs, video, and the phone number of the device itself, tending to show the identity of the user(s) of the device, the identities of associates and/or co-conspirators, and the contents of stored messages, photos, and/or video relating to the distribution of controlled substances.

14.     In my experience, persons involved in illegal activities and/or individuals involved in laundering proceeds from unlawful activities often keep the above-described documents for years, even though the underlying illegal activity or financial transactions occurred much earlier.

15.     The statements contained in this affidavit are based on my own investigation, my training and experience as a law enforcement agent, information provided to me by or through other law enforcement agents, investigators and individuals with knowledge of this matter, and through my review of documents related to this investigation. This affidavit summarizes such information in order to show that there is probable cause to believe that the items listed in Attachment B are believed to be in the location described in Attachment A and therefore does not purport to set forth all of the evidence gathered to date in this investigation. Based upon the information below, there is probable cause to believe Nehemiah DAY (YOB 2000) and others known and unknown, have unlawfully, knowingly and intentionally conspired to distribute controlled substances in violation of 21 U.S.C. 846, and laundered monetary instruments in

violation of 18 U.S.C. 1956, and that evidence of such violations are likely to be found at the **TARGET RESIDENCE**.

## PROBABLE CAUSE

16.     The DEA and other law enforcement officers are conducting a criminal investigation involving Nikolay KALACHIK, Nehemiah DAY, and others regarding possible violations of Title 21 USC 846 (Conspiracy to Possess a Controlled Substance with Intent to Distribute) and Title 18 USC 1956 (Laundering of Monetary Instruments).

17.     On July 6, 2024, the Seward County Sheriff's Office conducted a traffic stop of a Ford pickup towing a trailer which was traveling west on I-80 in Nebraska. Being carried on the trailer was a Ram Cargo van. The driver and sole occupant, identified as Nikolay KALACHIK (YOB: 1968), of Anderson, Indiana, advised law enforcement he was taking the van for repairs. Based on inconsistencies with KALACHIK's story, a K9 was deployed to conduct a sniff of the truck, trailer, and van. Following a positive K9 alert, law enforcement searched the vehicles. Inside of the Ram Sprinter van, law enforcement located approximately $1.4 million in US Currency suspected drug proceeds, which was seized. The US Currency was contained in vacuum sealed bags. The doors to the cargo area of the Ram Sprinter van were found to be bolted shut. An aftermarket speaker cable was located which allowed a switch in the passenger compartment of the Ram Sprinter van to open the rear cargo section of the Ram Sprinter van.

18.     I helped process the US Currency along with law enforcement from the DEA and the Seward County Sheriff's Office. While I was handling some of the bills, I could smell the odor of marijuana on many of them.

19.     Another investigator and I conducted a post-*Miranda* interview with KALACHIK. KALACHIK stated his boss is an Italian man named "ALEX". KALACHIK stated he picked up

the Ram Sprinter van in Chicago, Illinois, on Friday, July 5, 2024. KALACHIK stated he did not have access to the cargo area of the Ram Sprinter van. KALACHIK stated he receives an address from ALEX on where to pick up the van and where to deliver it to via text message from ALEX. On this trip, KALACHIK was supposed to deliver the van to an address in Encino, California. KALACHIK has driven vehicles for ALEX on several occasions. KALACHIK stated he has driven a Ram Sprinter van to California from Illinois, and then turned around and driven the same Ram Sprinter van back to Illinois. KALACHIK admitted that he did think it was strange that he would ship the same van back and forth across the country, and that none of the doors in the van would open. KALACHIK told investigators that ALEX instructed him to tell police he was taking the van for repairs if he were questioned about it. KALACHIK admitted that when he told the officer earlier on July 6, 2024, that he was taking the van for repairs, that he was telling a lie. KALACHIK advised that the organization he is working with has approximately 20 vans which were all similar.

20.         KALACHIK provided consent for law enforcement to search two cellular phones which he had in his possession. I observed text messages between KALACHIK and ALEX, which was saved in KALACHIK's cellular phone as "ALEX CA". In the messages, ALEX provides KALACHIK with several addresses. Some of the addresses include locations in Illinois, Washington, DC, Maryland, and California. Many of the messages contain photos of white Ram Sprinter-style vans. KALACHIK is also observed notifying ALEX of his expected times of arrival to various locations.

21.         On Wednesday, June 12, 2024, ALEX text messaged KALACHIK and asked "U say June 28 vacation?", to which KALACHIK responds "Yes, please". ALEX then states: "Ok no problem. Then work back July 5?", and KALACHIK responds "Yes!!!". On June 14, 2024,

KALACHIK text messaged ALEX and stated, "I wants to bring all amount today". On July 4, 2024, KALACHIK text messaged ALEX and confirmed "no change for tomorrow?", and ALEX confirmed "Yes all good for tomorrow". It should be noted this was approximately two days prior to KALACHIK being stopped by law enforcement in Seward County, Nebraska.

22.        On July 10, 2024, a traffic stop was conducted in Illinois on a pickup truck, towing a trailer, carrying a different Ram Sprinter van. Following a positive K9 alert on the vehicles, a search was conducted. The Ram Sprinter van was found to have a similar switch in the passenger compartment installed on it as the one from the Ram Sprinter van from the July 6, 2024, traffic stop in Seward County, Nebraska, which opened the rear cargo doors of the Ram Sprinter van. Following a search of the Ram Sprinter van, law enforcement located approximately 1,509 pounds of marijuana. A controlled delivery of the Ram van carrying the marijuana was conducted in Chicago, Illinois, and it led investigators to a garage with several more vans that were white in color. This investigation is ongoing, but at this time, it appears that it is related to the traffic stop in Nebraska on July 6, 2024, and subsequent seizure of approximately $1.4 million US Currency.

23.        On July 13, 2024, the Kansas Highway Patrol stopped a pickup towing a trailer which was hauling a Ram Sprinter van and a pickup truck. The traffic stop was based on a traffic violation. During the stop, probable cause was developed to search the vehicles. During a search of the Ram Sprinter van, approximately 909 pounds of marijuana were located in the cargo area of the van. It should be noted that prior to the search of the Ram Sprinter van, I was contacted by a law enforcement officer in Kansas regarding gaining entry to the Ram Sprinter van, as they were unable to open it. I advised law enforcement of the previously observed post-manufactured mechanism utilized to open the doors of the Nebraska and Illinois Ram Sprinter vans. It was discovered by officers during the July 13, 2024, Kansas traffic stop that the Ram Sprinter van had

an almost identical modification which was eventually utilized to open the rear cargo area of the van. I believe this indicates that the Kansas Ram Sprinter van was being utilized by the same organization which was utilizing the Ram Sprinter vans from the Nebraska and Illinois traffic stops on July 6 and July 10, respectively. The driver of the Kansas pickup agreed to cooperate and provided information. The driver stated the Ram Sprinter van was scheduled to be delivered to Chicago, Illinois. It should be noted that the delivery address was approximately two (2) blocks away from where the July 10 Ram Sprinter van was delivered. The Ram Sprinter van from the Kansas traffic stop was also picked up in Encino, California, approximately 1/3 mile away from where the July 6, 2024 van being driven by Nikolay KALACHIK was scheduled to be delivered to.

24.        Following the traffic stop of Nikolay KALACHIK and the seizure of the approximately $1.4 million US Currency suspected drug proceeds (referenced above in paragraphs 18-22), investigators with the DEA and the Seward County Sheriff's Office submitted the vacuum sealed packaging containing the US Currency for latent fingerprint examination at the Nebraska State Crime Laboratory. Following an analysis, a positive fingerprint for Nehemiah DAY was identified. Law enforcement identified Nehemiah DAY as a resident of the Milwaukee, Wisconsin, area, with a year of birth of 2000.

25.        On March 19, 2024, DEA investigators in Chicago, Illinois, were conducting surveillance at Midway Airport in the baggage area. While inspecting bags arriving on a flight from Los Angeles, California, investigators observed 15 pieces of luggage with different names on the tags but all the same brand. A K9 was used to conduct a sniff of all 15 pieces of luggage and the K9 subsequently alerted on all the bags for the presence of narcotic odor. Investigators continued conducting surveillance of the bags. Investigators identified several individuals who all

appeared to be waiting together in the baggage claim area, two of which were identified as Frankie DAY (YOB: 1984) and Nehemiah DAY. Law enforcement began talking to the owners of the suspected drug bags, at which time, Nehemiah DAY was observed walking away from the baggage area. Law enforcement asked for and was granted consent to search bags by the owners of six (6) bags. Investigators subsequently located a large amount of marijuana and marijuana "vape" cartridges inside all the bags. In total, law enforcement located and seized approximately 530 pounds of suspected marijuana from the bags. One of the individuals contacted by law enforcement advised they were paid $700.00 to transport the luggage from Los Angeles, California, to Chicago, Illinois. Airport surveillance video was later reviewed and showed all of the owners of the bags, including Frankie DAY, and Nehemiah DAY, associating with each other while waiting for bags. They were later observed on surveillance video departing the airport in taxi cabs in smaller groups following their contact with law enforcement. Investigators also located records and surveillance video from a hotel in Chicago where all of the bag owners, including Frankie DAY and Nehemiah DAY, later arrive.

26.     On August 21, 2025, the Honorable David Swanson of the First Judicial District of Wisconsin, at Milwaukee, signed a state search warrant authorizing law enforcement to receive location information for a telephone number utilized by Nehemiah DAY: (414)722-7479. An administrative subpoena return in May 2025 identified Nehemiah DAY as the subscriber for the telephone number. Since the beginning of the interception on DAY's phone, law enforcement has continued to monitor DAY's location. Law enforcement has observed DAY's cellular phone in the area of the **TARGET RESIDENCE** during the early morning hours on a mostly daily basis, indicating it is the primary residence of Nehemiah DAY.

27.        DAY has also been observed by West Allis PD Det. Nick Stachula arriving at the **TARGET RESIDENCE**  on June 27, 2025, in a blue in color Nissan Rogue.  Additionally, DAY was captured on surveillance video arriving at the **TARGET RESIDENCE** on July 1, 2025.  According to a utility check of the **TARGET RESIDENCE**, Shanieah BANKS (YOB: 2000) is the subscriber for services.  It is believed BANKS is the co-habitating partner of Nehemiah DAY.  BANKS has two businesses registered to the **TARGET RESIDENCE**:   S&S Home Healthcare LLC and S&S Care Connection for Kids LLC.  A search in a commercially available law enforcement database identifies the **TARGET RESIDENCE** listed for both BANKS and DAY.

28.        On July 1, 2025, I served a subpoena to Bank of America (Subpoena No. 2025R00274-002) requesting records for Nehemiah DAY.  On July 21, 2025, Bank of America responded to the subpoena service.  Nehemiah DAY opened a checking account ending in 6139 on July 16, 2024, and initially deposited $1,000.00.  Bank of America identified DAY as the sole customer of the checking account ending in 6139.  Between July 16, 2024, and August 8, 2024, DAY deposited a total of $27,660.00 US Currency in Wisconsin.  The deposit amounts ranged from $1,000.00 to $15,040.00.  Between July 22, 2024, and August 12, 2024, DAY withdrew a total of $26,000.00 US Currency in Los Angeles, California.  Based on the activity described above, it appears DAY is utilizing Bank of America checking account ending in 6139 to deposit money in one state and then quickly withdraw money in another state.  It is further suspicious that DAY is known to be associated with large scale marijuana trafficking in the Midwest and that he is withdrawing money in a known source state for bulk marijuana (California).  Bank of America also provided information that DAY  has a business credit card open with account number ending

in 0420 in the name ND Holding LLC. The address listed for this account is the **TARGET RESIDENCE**.

29.     On July 1, 2025, I served a subpoena to Wells Fargo Bank (Subpoena No. 2025R00274-006) requesting records for Nehemiah DAY.  On July 22, 2025, Wells Fargo Bank responded to the subpoena service.  Wells Fargo Bank identified Nehemiah DAY as the owner of several accounts, most notably a personally owned checking account ending in 1782 and a business checking account for ND Holding LLC, which is an account solely owned by Nehemiah DAY ending in 5409.  DAY listed the **TARGET RESIDENCE** on the signature card for the checking account ending in 1782.  On the business account application form for ND Holding LLC (account 5409) dated July 15, 2024, DAY had an opening deposit of $5,000.00 and DAY lists "Educational Services" as the business Industry for ND Holding LLC and "administration management" as the Description of Business.  DAY listed an email address of nehemiah@nehconsultingllc.com.  A check of the website nehconsultingllc.com displays a webpage with the message "Launching Soon".  A review of the records received from Wells Fargo shows several money orders in varying amounts which were deposited in ND Holding LLC (account 5409) at a branch in Milwaukee, Wisconsin.  The names of some of the remitters were Jerry Lawrence, Lisa Carter, Fredasharon Smith, and Elizabeth Summers.  I conducted a search in a commercially available law enforcement database for the name "Fredasharon Smith", which yielded no results for a search of the entire United States.  The other remitter names were too common and yielded results for several people with those names or their variations.  The account also had cash deposits in amounts ranging from approximately $120.00 to $20,030.00 which totaled approximately $89,000.00.  All of the cash deposits occurred at Wells Fargo Bank branches in Wisconsin.  The deposits were used for several cash withdrawals totaling approximately $72,500.00 at several Wells Fargo Bank branch locations

in California. Similar to his activity with Bank of America, Nehemiah DAY appears to be depositing money in Wisconsin and later withdrawing it in California. This is further suspicious as DAY has previously been identified as having his fingerprints on the packaging of suspected drug proceeds which were intercepted in Nebraska en-route to California, as described above.

30.       On June 26, 2025, I served a subpoena to Block Inc. (Subpoena No. 2025R00274-001) requesting records for Nehemiah DAY. On August 27, 2025, Block Inc. responded to the subpoena service. Block Inc. provided records for Cash App account C_5cetpaygy. The account was utilized by Nehemiah D. DAY with a listed date of birth of January 10, 2000, and a social security number ending in 7525. A phone number of (414)722-7479 is associated with the account, which is a phone number known by law enforcement to be utilized by Nehemiah DAY. The account was established in December 2023 and closed in June 2024. The account was closed by Block Inc. due to concerns by Block Inc. that the account was being utilized to engage in money laundering activities. In approximately six (6) months, the account was involved with approximately 270 peer to peer transactions totaling approximately $220,000.00. DAY also had approximately $84,000.00 in transfers to external bank accounts held by DAY. Most of the transactions identified involved funds sent from other accounts to Nehemiah DAY's account. A review of the records shows many of the transactions are for round dollar amounts. I know from training and experience that drugs are commonly sold in round dollar amounts. Additionally, the account shows that on several occasions, payments were received and then transferred out on the same day. For example, on April 4, 2024, DAY received a payment of $1,200.00. Later the same day, DAY transferred $1,201.48 to an external bank account. Most of the transactions range from $20.00 to $2,400.00.

31.　　　　On July 1, 2025, I served a subpoena to Educators Credit Union (hereafter ECU, Subpoena No. 2025R00274-003) requesting records for Nehemiah DAY.  On August 27. 2025, ECU responded to the subpoena service.  ECU identified Nehemiah DAY as the sole responsible individual for ND Holdings.  ECU provided information indicating DAY frequently "exchanged" US Currency in various branch locations.  I know that an "exchange" is trading small bills for larger bills.  On January 2, 2024, DAY exchanged $9.980.00.  On January 3, 2024, DAY exchanged $8.000.00 and then went to another branch location on the same day and exchanged another $7.900.00.  On February 5, 2024, DAY deposited $2,000.00 and the next day, on February 6, 2024, DAY exchanged $6,965.00.  On March 4, 2024, DAY made a deposit of $7,045.00.  On March 13, 2024, DAY made an exchange of $11,822.00 and on the same date DAY made another exchange of $10,080.00.  On March 25, 2024, DAY made a deposit of $10,245.00 and later the same day, DAY withdrew $9,245.00.  On the same date, DAY exchanged an additional $7,695.00.  On March 26, 2024, DAY exchanged $5,610.00. DAY then made an exchange of $9,000.00 at a different branch location, also on March 26, 2024.  On June 20, 2024, DAY deposited $59,670.00.  On June 22, 2024, DAY deposited $23,500.00.  On June 24, 2024, DAY deposited $26,960.00.  On July 9. 2024, DAY deposited $2,500.00.  On July 15, 2024, DAY deposited $16,203.00 in two transactions.  On the same date, DAY withdrew $16,200.00.  On September 3, 2024, DAY deposited $9,275.00 and the next day withdrew $13,000.00.  On November 7, 2024, DAY withdrew $30,000.00 and then deposited and again withdrew $8,240.00.  On July 7, 2025, DAY withdrew $9,700.00 and two days later, on July 9, 2025, DAY withdrew $7,000.00.  I know that drug traffickers often deal in US Currency in different denominations, which could explain why DAY exchanges currency for larger bills.  DAY's repeated deposits and withdrawals, sometimes

on the same day, is considered structuring and an evasion of a Currency Transaction Report (CTR) filing, especially since some of the transactions occurred at different branch locations.

32.          On July 1, 2025, I served a subpoena to JP Morgan Chase (Subpoena No. 2025R00274-004) requesting records for Nehemiah DAY. On September 3, 2025, JP Morgan Chase responded to the subpoena service. JP Morgan Chase provided a signature card for business checking account ending in 5707 in the name ND Holding LLC with a listed business address of 9000 W Chester St Suite 100, Milwaukee, Wisconsin. The account was opened July 15, 2024. The sole account owner is listed as Nehemiah DAY with a listed social security number ending 7525 and a listed telephone number (414)722-7479. In May 2025 the ND Holding LLC business account held by Nehemiah DAY had approximately $69,253.50 in deposits and approximately $74,050.00 in withdrawals. Of note are debit withdrawals from Illinois, which is significant as DAY has previously been involved with marijuana trafficking between Los Angeles, California, and Chicago, Illinois, as described above. In June 2025 the ND Holding LLC business account held by Nehemiah DAY had approximately $257,065.50 in deposits and approximately $143,073.00 in withdrawals. In July 2025, the ND Holding LLC business account held by Nehemiah DAY had approximately $3,640.50 in deposits and approximately $2,564.00 in withdrawals. I noted a cashier's check #317478 for $10,000.00 from PNC Bank dated October 4, 2024, from S&S Care Connection for Kids LLC to ND Holding LLC, deposited to business checking ending 5707 (ND Holding LLC). I located a business record from the state of Wisconsin indicating the registered agent for S&S Care Connection for Kids LLC is Shanieah Banks (suspected significant other of Nehemiah DAY) with a listed address of the **TARGET RESIDENCE**. I noted a cashier's check #9016938718 for $20,000.00 from Chase Bank business checking ending in 5707 (ND Holdings LLC, owned by Nehemiah DAY) to S&S Care Connection

for Kids LLC in July 2025. JP Morgan Chase noted the account owned by DAY ending 5707 saw high amounts of cash deposits, withdrawals, and exchanges from unknown sources with no known purpose and several of the deposits appeared to be structured to avoid the filing of a Currency Transaction Report. I noted DAY's use of several branches and ATM's, mostly in the state of Wisconsin. Included in the records from JP Morgan Chase was a checking account owned by Nehemiah DAY ending in 2477 with an address listed on statements of the **TARGET RESIDENCE**. Of note in this account are cash deposits as follows: $2,000.00 on August 6, 2024; $2,000.00 on August 6, 2024; $2,000.00 on August 6, 2024; $2,000.00 on August 6, 2024; $1,980.00 on August 6, 2024; $1,990.00 on August 7, 2024; $1,980.00 on August 7, 2024; $1,000.00 on August 7, 2024; and $990.00 on August 7, 2024. DAY then had a deposit of $6,240.00 on August 8, 2024. These deposits total $22,180.00 and would have evaded the filing of a Currency Transaction Report, which is a structuring violation. DAY then withdrew $15,000.00 on August 9, 2024, and he withdrew $7,000.00 on August 10, 2024. On August 20-21, 2024, DAY had debit card purchases at restaurants and convenience stores in Los Angeles, California.

33.         JP Morgan Chase identified a Chase Ink business credit card account ending in 4739 in the name Nehemiah DAY / ND Holdings LLC. In August 2024, a charge appears from United Airlines for $338.48 for a flight from Chicago, IL, to Los Angeles, CA. In August 2024, a charge appears from Avis Rent a Car for $266.68 in Milwaukee, WI. In September 2024 a charge appears from American Airlines for $345.48 for a flight from Chicago, IL, to Los Angeles, CA. In September 2024 a charge appears from American Airlines for $348.48 for a flight from Los Angeles, CA to Chicago, IL. In September 2024, a charge appears from National Car Rental in Las Vegas, NV, for $856.11.

34.          JP Morgan Chase identified a Chase Ink business credit card account ending in 6883 in the name Nehemiah DAY.  In August 2024, several charges appear in Los Angeles, California and Hollywood, California.  Also observed is a charge for $978.73 from National Car Rental in Las Vegas, Nevada and a charge for $153.00 from Enterprise Rent a Car in Los Angeles, California.  Approximately three days later, DAY has account activity in Wisconsin.  Approximately one week later, DAY has charges from Alamo Car Rental in Inglewood, CA for $360.59 and Sheraton Grand Los Angeles, CA, for $762.83.  In September 2024, DAY had a charge of $385.48 from American Airlines for a flight from Chicago, IL, to Los Angeles, CA.  Approximately three days later, DAY has a charge for $348.48 from American Airlines for a flight from Los Angeles, CA to Chicago, IL.  DAY also has a charge for $4,134.16 from Enterprise Car Rental in West Allis, Wisconsin in September 2024.  In October 2024, DAY has a charge from American Airlines for a flight from Los Angeles, CA, to Chicago, IL.

35.          Although the specific nature of DAY's trips to California are unknown, I noted the frequency of the trips as unusual along with the instant investigation involving DAY's connection to bulk marijuana smuggling from California and the transportation of suspected drug proceeds to California.

36.          On July 1, 2025, I served a subpoena to US Bank (Subpoena No. 2025R00274-005) requesting records for Nehemiah DAY.  On September 9, 2025, US Bank responded to the subpoena service.  US Bank provided a signature card for business checking account ending in 7878 in the name ND Holding LLC with a listed business address of the **TARGET RESIDENCE**.  Nehemiah DAY signed the signature card under "Agents Authorized to Act on Behalf of Company" as the "CEO" of ND Holding LLC on August 26, 2024.  Of note on the account were two cash deposits for $6,800.00 on August 26, 2024, and $10,000.00 on October 3, 2024, totaling

$16,800.00. These deposits funded cash withdrawals of $5,000.00 on October 10, 2024, $6,000.00 on October 11, 2024, and $2,500.00 on November 14, 2024. Similar to his activity at other banks, DAY appears to have structured the two cash withdrawals on October 10, 2024, and October 11, 2024, seemingly to avoid a currency transaction report filing (transactions over $10,000.00). No other significant transactions occurred with the account and the activity described above all took place between August 2024 and November 2024.

37.         In summary: Nehemiah DAY has been involved with the seizure of US Currency in July 2024 where his fingerprints were located on the packaging of $1.4m in suspected drug proceeds. The US Currency was interdicted in Nebraska en-route to California. DAY was also present for the seizure of approximately 500 pounds of marijuana at Midway Airport in March 2024 which was inbound from Los Angeles, California. Based on analysis of DAY's financial records, it appears DAY has previously engaged in depositing large amounts of US Currency in Wisconsin and later withdrawing it in California within days. I know from training and experience that California is a source state for drugs, specifically bulk amounts of marijuana. In addition to the above described suspicious banking activity, DAY has a history of exchanging currency at bank branches for larger bills. Some of these exchanges have been as recent as July 2025. Many of the bank accounts DAY has utilized have the **TARGET RESIDENCE** listed as DAY's address on file. DAY also has frequent travel to California with no apparent legitimate reason. DAY has been observed at the **TARGET RESIDENCE** on several occasions and based on the phone ping currently installed on his electronic device, DAY is located in the area of the **TARGET RESIDENCE** on most days during the early morning hours. Based on all of the above facts and my experience in conducting drug and money laundering cases, I believe probable cause exists to search the **TARGET RESIDENCE** for the items listed in the Attachment B of this application.

In many of the investigations I have conducted, I have located bank records, wire transfer records, drug ledgers, tax returns, shipping and receiving documents, cellular phones, and electronics, among other relevant items, which were several months if not years old. Based on DAY's longstanding track record of criminal activity, I believe all of these items will be beneficial to this criminal investigation. Many of the items listed in the Attachment B can reasonably be expected to be located inside a person's residence for months if not years.

38.     As stated above, I believe investigators can expect to locate electronics inside the **TARGET RESIDENCE.** Based on my experience in conducting large scale drug trafficking and money laundering investigations, I have observed that drug traffickers and money launderers conduct nearly all of their business through the use of cellular phones. Drug traffickers arrange drug transactions, discuss drug prices and weights, and coordinate meeting locations. Money launderers conduct financial transactions, discuss laundering techniques and operations, and coordinate money drops/pickups. Cellular phones have been utilized to arrange nearly every controlled purchase operation I have participated in. Drug traffickers and money launderers also utilize online banking applications and money transfer services such as Zelle, Venmo, and Cash App, among others. Drug traffickers and money launderers utilize encrypted messaging services such as WhatsApp and Signal in an effort to evade law enforcement detection. In reviewing the devices of drug traffickers and money launderers, I have noticed they will make phone calls and send text messages to co-conspirators, take photographs of drugs and drug proceeds, and have records of drug related money transactions on their devices. I have also found many of the items described above while reviewing tablets, such as Apple iPads, and computers. I have observed it is very common for drug traffickers and money launderers to utilize multiple cellular phones. In this investigation, law enforcement has identified two different phone numbers utilized by DAY.

I believe the above information gives rise to probable cause that evidence of the crimes mentioned above will be located on the electronic devices belonging to DAY inside the **TARGET RESIDENCE**.

**Computers, Electronic Storage and Forensic Analysis**

39.        As described above and in the Attachments B, this application seeks permission to search for records that might be found inside the **TARGET RESIDENCE** in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

40.        *Probable cause.*  I submit that if a computer, cellular telephone, or storage medium is found inside the **TARGET RESIDENCE**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.        Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.        Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—

for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

41.      *Forensic evidence.* As further described in Attachments B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **TARGET RESIDENCE** because:

  a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage

medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that

connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as

to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

42.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and

configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

43.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

44.    The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match

those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

    d.  If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

45.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

46.      As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

47.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours

has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

48.     Due to the foregoing, with respect to any person who is located inside the **TARGET RESIDENCE** during the execution of the search and who is reasonably believe by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant, it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs) of the person to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the person's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

49.     Because several people may share the **TARGET RESIDENCE** as a residence, it is possible that **TARGET RESIDENCE** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## <u>CONCLUSION</u>

50.     Based on the foregoing, there is probable cause to believe Nikolay KALACHIK, Nehemiah DAY, and others known and unknown, have unlawfully, knowingly and intentionally conspired to distribute, and/or possess with intent to distribute controlled substances in violation

of Title 21 U.S.C. 846, and laundering monetary instruments in violation of Title 18 U.S.C. 1956. Therefore, I believe that probable cause will exist to search the **TARGET RESIDENCE** identified in Attachment A for evidence of violations of 21 U.S.C 846, and 18 U.S.C. 1956, conspiracy to distribute and possess with intent to distribute controlled substances and laundering of monetary instruments, respectively. There is probable cause to believe that the above described real property and premises contain property designed or intended for use and which is and has been used as the means of committing the offense; and those items listed on Attachment B (which is incorporated herein by reference).

51.  I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

**Attachment A**

1.      This affidavit is submitted in support of an application for a search warrant for the following location: The real property and premises known as **11361 WEST PEREGRINE WAY, GREENFIELD, WISCONSIN, 53130** and all storage areas associated with the residence (attached or detached), (**TARGET RESIDENCE**).  The property is a single-family, condominium style home, located on the east side portion of the multi-family structure, where West Wingspan Lane and West Peregrine Way meet. The pedestrian door to 11361 WEST PEREGRINE WAY, is situated on the east side of the structure and is the furthermost northern door. The numbers "11361" are affixed above the attached overhead garage door, which faces north towards West Wingspan Lane. The building has tan colored siding and brick facia, and a single car driveway leading up to an attached garage.



**Attachment B**

**Items To Be Seized**

Evidence of a violation or violations of Title 21 U.S.C. 846 (controlled substances trafficking) and Title 18 U.S.C. 1956 (Money Laundering), including the following:

1.      Marijuana, and/or any other controlled substances.

2.      Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances.

3.      Address and telephone books and papers reflecting names, addresses or telephone numbers.

4.      Books, records, receipts, bank statements and records, money drafts, letters of credit, money order and cashier's checks, receipts, pass books, bank checks and any other items evidencing the obtaining, secreting, transfer, or concealment of assets in the obtaining, secreting, transfer, concealment or expenditure of money.

5.      Purchase agreements, rental agreements, tax records, financial documents, to include but not limited to receipts, invoices, bills, ledgers, journals and other records related to income, expenditures and the purchase or sale of assets.

6.      Brokerage account statements, investment related records, other documents and items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment, and/or expenditure of money.

7.      Electronic equipment, such as cellular telephones, computers, telex machines, currency counting machines, and any information stored in memory or contained in any related hardware and software.

8.      United States currency, precious metals, jewelry and financial instruments, including but not limited to, stocks and bonds.

9.  Photographs, in particular, photographs of conspirators, of assets, or of controlled substances, and other documents identifying associates and conspirators.

10. Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including but not limited to, pill presses, scales and baggies.

11. Indicia of occupancy, residency, or ownership of the premises, including but not limited to, utility and telephone bills, canceled envelopes, and keys, as it related to the instant drug investigation.

12. Firearms.

13. Any locked or closed containers believed to contain any of the above listed evidence

14. Computers, cellular telephones, or storage media used as a means to commit the violations described above;

For any computer, cellular phone, electronic device, and storage medium whose seizure is otherwise authorized by this warrant, and any computer, cellular phone, electronic device, and storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

     a. Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

     b. Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

of the presence or absence of security software designed to detect malicious software;

c. Evidence of the lack of such malicious software;

d. Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. Evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. Evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. Evidence of the times the COMPUTER was used;

i. Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. Records of or information about Internet Protocol addresses used by the COMPUTER;

l. Records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.  Contextual information necessary to understand the evidence described in this attachment.

15.    Records, information, and items relating to violations of the statutes described above, including:

a.  Records, information, and items relating to the occupancy or ownership of the TARGET RESIDENCE, including utility and telephone bills, mail envelopes, or addressed correspondence; records, information, and items relating to the ownership or use of computer equipment found in the above TARGET RESIDENCE, including sales receipts, bills for Internet access, and handwritten notes; and

b.  Records and information relating to the identity or location of the persons suspected of violating the statute(s) described above.

16.    As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies). The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware. The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media. During the execution of the search of the TARGET RESIDENCE described in Attachment A, law

enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.